**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DONALD GRAVELET-BLONDIN; KRISTI GRAVELET-BLONDIN, *Plaintiffs-Appellants*, v. SGT. JEFF SHELTON; CITY OF SNOHOMISH, *Defendants-Appellees*. | No. 12-35121 D.C. No. 2:09-cv-01487-RSL OPINION |

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
May 10, 2013—Seattle, Washington

Filed September 6, 2013

Before: Michael Daly Hawkins and Jacqueline H. Nguyen,
Circuit Judges, and James V. Selna, District Judge.[*]

Opinion by Judge Hawkins;
Dissent by Judge Nguyen

---

[*] The Honorable James V. Selna, District Judge for the U.S. District Court for the Central District of California, sitting by designation.

# SUMMARY[**]

## Civil Rights

The panel reversed the district court's summary judgment and remanded in an action brought pursuant to 42 U.S.C. § 1983 and state law alleging that police officers used excessive force by tasing a passive bystander in dart mode and then arresting him for obstruction of justice.

Plaintiff Donald Gravelet-Blondin was tased and arrested after he allegedly failed to comply immediately with an officer order to move away from the scene where his neighbor was being arrested. The panel first determined that, taking the evidence in the light most favorable to Donald and his co-plaintiff wife, the discharge of a taser in dart mode was unreasonable given that Donald's alleged crime was minor and there was no reason to believe, based on his behavior, demeanor, and distance from the officers, that he posed an immediate threat to anyone's safety. The panel further held that the police officer who tased Donald was not entitled to qualified immunity because it was well known as of 2008 that a taser in dart mode constituted more than trivial force.

The panel also reversed the district court's summary judgment on plaintiffs' excessive force claim against the City and remanded. The panel further held that a genuine issue of fact remained as to whether there was probable cause to arrest Donald for obstructing a police officer. The panel instructed the district court on remand to consider whether qualified

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

immunity or *Monell* liability applied to the unlawful arrest claim. Finally, the panel reversed the district court's summary judgment on plaintiffs' common law claims for malicious prosecution and outrage.

Dissenting, Judge Nguyen stated that the majority went badly astray because it lost sight of the specific context of this case and employed hindsight rather than viewing the scene through the eyes of a reasonable officer.

**COUNSEL**

Timothy K. Ford (argued) and Joseph R. Shaeffer, MacDonald Hoague & Bayless, Seattle, Washington, for Plaintiffs-Appellants.

Richard B. Jolley (argued) and Adam Rosenberg, Keating, Bucklin & McCormack, Inc., Seattle, Washington, for Defendants-Appellees.

**OPINION**

HAWKINS, Senior Circuit Judge:

We must decide whether it was clearly established as of 2008 that the use of a taser in dart mode against a passive bystander amounts to unconstitutionally excessive force within the meaning of the Fourth Amendment.[1] Because we

---

[1] We proceed by answering this question in two parts, considering first whether it was clearly established that it is unconstitutionally excessive to use non-trivial force in response to mere passive resistance, and second,

determine that it was, we reverse the contrary conclusion of the district court and remand.[2]

# I. BACKGROUND

In the early evening of May 4, 2008, Sergeant Jeff Shelton and four other officers from the Snohomish, Washington Police Department were dispatched to respond to a 911 call of a suicide in progress made by family members of an elderly suspect, Jack. When the officers arrived at Jack's home he was sitting in his car, which was parked in the side yard of his house, with a hose running from the exhaust pipe into one of the car's windows. The officers had been warned that Jack owned a gun and would have it with him. Sgt. Shelton took precautions to ensure officer safety and then asked Jack to get out of the car.

After several requests Jack finally complied, turning his car off and stepping out with his hands at his sides. When Jack refused multiple commands to show his hands, Sgt. Shelton—concerned that Jack might gain access to a gun—instructed another officer to tase Jack in dart mode.[3]

---

whether it was clearly established that a taser in dart mode constitutes non-trivial force. We disagree with the dissent's concern that we are undertaking this constitutional inquiry at too high a level of generality.

[2] We reverse the court's grant of summary judgment on a number of related claims, as well.

[3] In "dart mode," a taser:

> uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the [taser] by insulated

Jack fell to the ground and, as officers attempted to restrain and handcuff him, he pulled his arms underneath him. He was then tased a second time.

Donald and Kristi Gravelet-Blondin ("the Blondins"), Jack's neighbors, were watching TV at home when the police arrived at the scene. They heard noise coming from the direction of Jack's house and went outside—Donald Blondin ("Blondin") in shorts, a t-shirt, and slippers—to investigate and make sure their neighbor was all right. When they stepped into the yard between Jack's house and their own, the Blondins heard Jack moaning in pain, and Blondin saw officers holding Jack on the ground.

Blondin called out, "what are you doing to Jack?" He was standing some thirty-seven feet from Jack and the officers at the time, with Jack's car positioned in between.[4] At least two of the officers holding Jack yelled commands at

> wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the [taser] delivers a 1200 volt, low ampere electrical charge . . . The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.

*Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010)) (internal quotation marks omitted), *cert. denied*, 132 S. Ct. 2681 (2012), *and cert. denied*, 132 S. Ct. 2682 (2012), *and cert. denied*, 132 S. Ct. 2684 (2012).

[4] Blondin's calculation is based on measurements he took the day after the incident; officers on the scene took no measurements and have given varying estimates as to how far away Blondin was standing, ranging from ten to twenty-five feet.

Blondin: one instructed him to "get back," while another told him to "stop." According to a bystander watching the scene unfold, Blondin took one or two steps back and then stopped. Blondin recalls that he simply stopped. Sgt. Shelton then ran towards Blondin, pointing a taser at him and yelling at him to "get back." Blondin froze. The bystander testified that Blondin "appeared frozen with fear," and Defendants have conceded that he made no threatening gestures.

Sgt. Shelton began to warn Blondin that he would be tased if he did not leave, but fired his taser before he had finished giving that warning. Sgt. Shelton tased Blondin in dart mode, knocking him down and causing excruciating pain, paralysis, and loss of muscle control. Blondin, disoriented and weak, began to hyperventilate. Sgt. Shelton asked Blondin if he "want[ed] it again" before turning to Ms. Blondin and warning, "You're next." Sgt. Shelton then ordered another officer to handcuff Blondin. Paramedics called to the scene removed the taser's barbs from Blondin's body and tried to keep him from hyperventilating. Blondin was arrested and charged with obstructing a police officer, a charge that was ultimately dropped.

The Blondins then initiated this action, suing the City of Snohomish ("the City") and Sgt. Shelton for excessive force and unlawful arrest in violation of 42 U.S.C. § 1983, and malicious prosecution in violation of Washington law, for the tasing and arrest of Blondin. Ms. Blondin also sued for outrage under state law for the harm she suffered watching her husband's tasing and being threatened with tasing herself. After considering cross-motions for summary judgment, the district court granted summary judgment to Defendants on all claims.

## II.  STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo.  *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011).  In determining whether genuine issues of material fact remain, we are required to view all evidence and draw all inferences "in the light most favorable to the non-moving party," here, the Blondins.  *Id.*

## III. DISCUSSION

### A.  Excessive Force

We begin with the district court's grant of summary judgment to Defendants on the Blondins' excessive force claim.  We agree that the Blondins have shown a constitutional violation but disagree that neither Sgt. Shelton nor the City may be held liable for it.

### 1.  Constitutional Violation

The Fourth Amendment, which protects against excessive force in the course of an arrest, requires that we examine the objective reasonableness of a particular use of force to determine whether it was indeed excessive.  *Graham v. Connor*, 490 U.S. 386, 394–95, 398 (1989); *see also Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012).  To assess objective reasonableness, we weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted).

Here, the intrusion on Blondin's Fourth Amendment interests—the discharge of a taser in dart mode upon him—involved an intermediate level of force with "physiological effects, [] high levels of pain, and foreseeable risk of physical injury." *Bryan*, 630 F.3d at 825.

*Graham* provides a non-exhaustive list of factors to consider in determining the governmental interests at stake, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Each factor reveals the unreasonableness of the use of intermediate force against Blondin.

First, as we explain below, a fact question remains as to whether there was sufficient probable cause to arrest Blondin for obstruction. Even if he committed a crime, though, that crime—failing to immediately comply with an officer order to get back from the scene of an arrest, when he was already standing thirty-seven feet away—was far from severe. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (trespassing and obstructing a police officer were not "serious offenses"); *see also Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (domestic violence suspect was not "particularly dangerous," and his offense was not "especially egregious").

Second, there was no reason to believe, based on Blondin's behavior, demeanor, and distance from the officers, that he posed an immediate threat to anyone's safety. In urging that officers reasonably could have thought Blondin posed such a threat, Defendants rely primarily on the officers' perception that Blondin was standing too close to them,

between six and twenty feet away, and that he "never manifested a benign motive." The argument that Blondin was less than twenty-one feet from officers—which Defendants identify as "the threshold for danger" —improperly resolves a fact question in their own favor. Construing the facts in Blondin's favor, as we must, he was standing thirty-seven feet away. Blondin's failure to affirmatively exhibit a "benign motive" is likewise insufficient to demonstrate that he reasonably could have been perceived as posing an immediate threat, especially in light of witness testimony that he was perceptibly frozen with fear.

Defendants also urge us to consider Jack's then-unlocated gun as a basis for the officers' belief that Blondin posed a threat. As the district court observed, the officers' purported fear that Blondin might have a gun was "based on nothing more than the reality that any civilian could be armed, speculation that fails to distinguish [Blondin] from any bystander at a crime scene." *See Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."), *cert. denied*, 536 U.S. 958 (2002).

Finally, Blondin did not resist arrest or attempt to escape. While "purely passive resistance can support the use of some force, [] the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Bryan*, 630 F.3d at 830. In *City of Hemet*, for example, we addressed the nature of resistance exhibited by "an individual who continually ignored officer commands to remove his hands from his pockets and to not re-enter his home," and who "physically resisted" for a brief time. *Id.* (quoting *City of Hemet*, 394 F.3d at 703) (internal quotation

marks omitted). Though the individual "was not perfectly passive," *id.*, we emphasized that his resistance was not "particularly bellicose" and as a result concluded that the third *Graham* factor offered little support for the use of significant force against him. *City of Hemet*, 394 F.3d at 703.

Here, Blondin stood still for approximately fifteen seconds after receiving the first order to "get back," which was given simultaneously with a contradictory order to "stop." Even less time passed, then, between Sgt. Shelton's subsequent, unequivocal "get back" command and the tasing. Though Blondin did not retreat during this brief period, he was perfectly passive, engaged in no resistance, and did nothing that could be deemed "particularly bellicose."

In evaluating objective reasonableness, we often must look beyond *Graham*'s enumerated factors and consider other elements relevant to the totality of the circumstances. *Bryan*, 630 F.3d at 826. As we have noted in the domestic violence context, the "danger that the overall situation pose[s] to the officers' safety and what effect that has on the reasonableness of the officers' actions" may be an appropriate consideration. *Mattos*, 661 F.3d at 450. Here, officers testified that suicide calls present unique risks. Suicidal individuals can quickly turn homicidal and may engage police officers in an effort to commit "suicide by cop." But unlike in *Mattos*, where the individual who resisted officer orders and was ultimately tased was the suspected victim in the domestic violence call, and therefore integrally involved in the volatile situation to which officers were responding, Blondin was a bystander thirty-seven feet away without any perceptible connection to the underlying crime—Jack's attempted suicide. It strains

logic to attribute any of the dangers involved in responding to suicide calls to him.[5]

Finally, as we have recognized before, the absence of a warning of the imminent use of force, when giving such a warning is plausible, weighs in favor of finding a constitutional violation. *See Mattos*, 661 F.3d at 451; *Deorle*, 272 F.3d at 1283–84. Here, though Sgt. Shelton gave such a warning, he did so as he fired his taser, leaving Blondin no time to react and rendering the warning meaningless.

Taking the evidence in the light most favorable to the Blondins, a reasonable factfinder could conclude that Sgt. Shelton's use of force was unreasonable and excessive, in violation of the Fourth Amendment.

### 2. Qualified Immunity

Even so, Sgt. Shelton is entitled to qualified immunity if his conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Having concluded that Sgt. Shelton may indeed have used excessive force in violation of the Fourth Amendment, we now consider whether the right to be free from such force was clearly established at the time of the incident. *See Mattos*, 661 F.3d at 446.

---

[5] We agree with the dissent that officers responding to suicide calls face a risk that the suspect may attempt to "go out in a blaze of glory," and we accept that Jack potentially posed such a threat. We fail to grasp the attribution of any part of that threat to Blondin.

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation and internal quotation marks omitted). We bear in mind, however, that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. We are "particularly mindful of this principle in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry." *Mattos*, 661 F.3d at 442. But while there need not be a "case directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008. *See Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (cases dating back to 2001 have established that "[a] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"). In *Deorle*, for example, we held that shooting a beanbag projectile at a suicidal, irrational individual who was walking directly towards an officer was excessive, given that the crime he committed was minor, the danger to the officer and others was minimal, there was no immediate need to subdue him, and he was not given any warning that he would be shot if he continued to approach the officer. 272 F.3d at 1282. We also denied qualified immunity, concluding that every police officer should have known that it was objectively unreasonable to use such force under those circumstances. *Id.* at 1285. In *Headwaters*

*Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002), we considered the use of pepper spray to subdue, remove, or arrest nonviolent protesters and held that "[t]he law regarding a police officer's use of force against a passive individual was sufficiently clear" in 1997 to put officers on notice that such force was excessive. *Id.* at 1131.

Though these cases do not concern tasers, they need not. As we explained in *Deorle*, "[i]t does not matter that no case of this court directly addresses the use of [a particular weapon]; we have held that '[a]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.'" 272 F.3d at 1286 (quoting *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)). Indeed, even absent taser-specific case law, three of our sister circuits have held that the law was clearly established, prior to 2008, that the use of a taser can in some instances constitute excessive force.[6]

---

[6] *See Shekleton v. Eichenberger*, 677 F.3d 361, 366–67 (8th Cir. 2012) (clearly established as of 2008 that tasing "an unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him" was excessive); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010) (clearly established as of 2006 that a police officer could not tase "a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning"); *Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (clearly established as of 2005 that tasing an individual who "posed at most a minimal safety threat . . . and was not actively resisting arrest or attempting to flee" was unconstitutional); *Oliver v. Fiorino*, 586 F.3d 898, 906–08 (11th Cir. 2009) (clearly established as of 2004 that it was excessive to tase multiple times an individual who had engaged in a brief physical struggle with a police officer, because, after the first tasing, the individual was immobilized). These cases are not at odds with our own

Still, relying on our grants of qualified immunity in *Bryan* and *Mattos*, Defendants argue that the law was insufficiently clear before 2010—when we first identified tasers in dart mode as an intermediate level of force, *Bryan*, 630 F.3d at 826—to put Sgt. Shelton on notice that his use of a taser against Blondin was excessive. But this case is factually distinguishable from *Bryan* and *Mattos* in one critical respect: Blondin engaged in no behavior that could have been perceived by Sgt. Shelton as threatening or resisting. As a result, the use of non-trivial force of any kind was unreasonable.

Though none of the plaintiffs in *Bryan* and *Mattos* engaged in serious resistance, each either took an affirmative step to contravene officer orders or engaged in behavior that posed some threat to officer safety. In *Bryan*, after being pulled over for a seatbelt infraction and ordered to stay in the car, Bryan exited his car, acted belligerent, and ignored repeated orders to get back in the car. 630 F.3d at 822. We interpreted even this behavior as "passive" or "minor" resistance, rather than "truly active resistance." *Id.* at 830.

Like Bryan, Brooks, the first of two plaintiffs addressed in *Mattos*, was pulled over for a traffic violation after which she refused to comply with officer orders. 661 F.3d at 443. Brooks then physically resisted officers' attempts to remove her from the car by keeping her hands on the steering wheel.

---

prior opinions granting qualified immunity because the law regarding tasers was insufficiently clear—namely, *Bryan*, 630 F.3d 805, and *Mattos*, 661 F.3d 433. The extent to which the law is "clearly established" in the Fourth Amendment reasonableness context is fact-specific, and none of these out-of-circuit cases are factually analogous to *Bryan* or *Mattos*.

*Id.* at 443, 445 (noting that "Brooks engaged in some resistance to arrest").

Finally, Mattos, a suspected domestic violence victim, was physically blocking officer access to the suspect, her husband, and put her hands on an officer when he tried to pass by her to arrest her husband. *Id.* at 439. When the officer asked Mattos if she was "touching an officer," she did not respond, did not move aside, and, ignoring the officer, urged another officer to move the confrontation outside. *Id.*

Here, evaluating the situation from Sgt. Shelton's perspective, Blondin—who, unlike Bryan, Brooks, and Mattos, had no connection to the underlying crime— committed no act of resistance. He took no affirmative step to violate an officer order (Bryan), did not physically resist officers (Brooks), and neither made physical contact with an officer nor tried to interfere with efforts to arrest a suspect (Mattos). His momentary failure to move farther than thirty-seven feet away from officers arresting his neighbor,[7] after merely inquiring into what those officers were doing, can hardly be considered resistance. This is especially so given evidence that Blondin was visibly frozen with fear.

---

[7] The dissent takes issue with our characterization of Blondin's failure to respond to the "get back" order as "momentary," urging that Blondin "refus[ed] to comply with officers' orders" for fifteen seconds. As we have explained, though, fifteen seconds passed between the simultaneous conflicting commands to "get back" and to "stop"—orders with which Blondin at least partially complied—and the tasing. After Blondin complied with the initial orders, either by simply stopping or by stepping back and then stopping, Sgt. Shelton ran at him, taser pointed, yelling at him to "get back." It is the time from this *unequivocal* "get back" command to the tasing, less than fifteen seconds, that matters.

Having determined that the right to be free from the application of non-trivial force for engaging in passive resistance was clearly established prior to 2008, we proceed to the second part of our constitutional inquiry,**[8]** considering a question that was not before us in *Bryan* or *Mattos*: whether it was clear in 2008 that using a taser in dart mode was *non-trivial*.**[9]**

In 2005 we acknowledged that tasers, like stunbag shotguns, are one of a "variety of non-lethal 'pain compliance' weapons used by police forces." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*,

---

[8] The dissent's concern that we frame our inquiry in terms of "non-trivial force" broadly, treating all "non-trivial force" alike, ignores this taser-specific portion of our constitutional inquiry entirely.

[9] Even had the facts of *Bryan* or *Mattos* called for such an inquiry, the answer in those cases might well have been "no." The dearth of case law regarding this "relatively new implement of force," *Bryan*, 630 F.3d at 833 (citation and internal quotation marks omitted), animated our grants of qualified immunity in those cases. In *Bryan*, for example, we emphasized that as of 2005 "there was no Supreme Court decision or decision of our court addressing" the force involved in using a taser in dart mode. *Id.*

In *Mattos*, reviewing two taser cases involving unrelated incidents in 2004 and 2006, we noted that there were only three circuit court opinions concerning taser use at the time of those incidents—*Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992), *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993), and *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004)—and each "reject[ed] claims that the use of a taser constituted excessive force." 661 F.3d at 446–48. Underscoring the absence of a single circuit case finding a Fourth Amendment violation, we could not conclude "that *every* reasonable officer would have understood . . . *beyond debate*" that tasing the plaintiffs, Brooks and Mattos, constituted excessive force. *Id.* at 448 (citation and internal quotation marks omitted).

402 F.3d 962, 969 (9th Cir. 2005). By 2008, the Tenth Circuit and a number of district courts had found taser use unconstitutionally excessive in some circumstances. Because "[a]bsent binding precedent, we look to all available decisional law, including the law of other circuits and district courts, to determine whether [a] right was clearly established," *Inouye v. Kemna*, 504 F.3d 705, 714 (9th Cir. 2007) (citation and internal quotation marks omitted), those decisions are relevant here. *See Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002) ("[U]npublished decisions of district courts may inform our qualified immunity analysis.").

In 2007, the Tenth Circuit held that using a taser immediately and without warning against a misdemeanant who did not "present[] an immediate threat of death or serious injury to himself or others" was unconstitutionally excessive. *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007) (internal quotation marks omitted). The court distinguished prior taser cases in which no Fourth Amendment violation was found, explaining that what had justified taser use in the Tenth Circuit's own earlier case, *Hinton v. City of Elwood*, was "active resistance to arrest." *Id.* (citing *Hinton*, 997 F.2d at 776–77, 781). As to the Eleventh Circuit's previous taser case, *Draper v. Reynolds*, the court explained that, though it might have decided that case differently, the plaintiff there had been "belligerent and hostile," and had refused five officer commands. *Id*. (citing *Draper*, 369 F.3d at 1276–77). The court in *Casey* ultimately denied qualified immunity because the tasing so clearly failed the *Graham* reasonableness test—there were "no substantial grounds for a reasonable officer to conclude that there was a legitimate justification" for tasing the plaintiff—that it violated clearly established law. *Id.* at 1286 (citation and internal quotation marks omitted).

Also in 2007, a district court in the Western District of Washington, within which Defendants operate, held that tasers constitute "significant force." *Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1144 (W.D. Wash. 2007), *aff'd*, 301 F. App'x 704 (9th Cir. 2008). Examining whether such force was objectively reasonable against a suspected felon who, after fleeing the scene, had already been tased by another officer three times, the court held that a fourth tasing was excessive in light of the absence of active resistance. *Id.* at 1144–46. In reaching that conclusion, the court noted that, "[a]lthough infliction of pain as a motivator is not the primary function of a properly deployed [t]aser, pain is a necessary byproduct of its use." *Id.* at 1143. The court granted qualified immunity, however, finding that the law in 2004 was not sufficiently well-established to have alerted officers that this use of force was unconstitutional.

Another decision from the Western District of Washington in 2006 likewise found taser use to be excessive, observing that the tasing was unnecessary to effectuate the arrest or to protect officers' safety. *Harris v. Cnty. of King*, C05-1121C, 2006 WL 2711769, at *3 (W.D. Wash. Sept. 21, 2006). In denying qualified immunity, the district court noted "the intuitively gratuitous nature of administering painful electric shocks to an arrestee who is passively complying with an officer's orders." *Id.* at *4.

We do not look to these cases to establish Blondin's right to be free from non-trivial force in response to his total lack of resistance—as discussed above, that right was established within our own circuit as early as 2001, such that, by 2008, it was "beyond debate" that using non-trivial force in response to such passive bystander behavior would be unconstitutionally excessive. *al-Kidd*, 131 S. Ct. at 2083.

Instead, they support our determination that, though the specific level of force involved in using a taser was not clear until 2010, it was well known as of 2008 that a taser in dart mode constitutes more than trivial force. Sgt. Shelton is therefore not entitled to qualified immunity.

### 3. Municipal Liability

While local governments may be sued under § 1983, they cannot be held vicariously liable for their employees' constitutional violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 694 (1978). Instead, a municipality is subject to suit under § 1983 only "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (quoting *Monell*, 436 U.S. at 690).

A plaintiff seeking to establish municipal liability must demonstrate, moreover, that the government "had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation he suffered." *Galen v. County of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007) (quoting *Monell*, 436 U.S. at 694–95). To meet this requirement, the plaintiff must show both causation-in-fact and proximate causation. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). The Blondins' excessive force claim against the City is based on both the City's policy regarding tasers generally, and its ratification of Sgt. Shelton's use of a taser in this case.

We turn first to the City's policy, no longer in effect, defining tasers as a low level of force—lower than any other

hands-on force, including a firm grip. Sgt. Shelton, at one time a taser instructor for the Snohomish Police Department, described the policy as classifying tasers as a "low," "very low," or "very, very low" level of force. He also explained that, pursuant to the City's taser policy, "I don't need to be threatened to use a taser." The City concedes that its former policy was unconstitutional but contends the policy did not cause Sgt. Shelton's use of unconstitutionally excessive force in this case.

At first blush, the City's evidence seems to support its argument: Sgt. Shelton has testified that he did not tase Blondin because of any particular City policy, and that he believes he could have used even greater force on Blondin. But a year after the incident in this case, in response to a performance evaluation regarding a different incident that reprimanded Sgt. Shelton for being "too quick to apply the taser when basic hands on defensive tactics would have brought the subject into compliance," Sgt. Shelton wrote that he had "never [t]asered anyone inappropriately or *out of policy*" (emphasis added). This statement reflects Sgt. Shelton's belief that all of his taser deployments, including, of course, the one at issue here, were consistent with City policy. As one of Defendants' experts acknowledged, police department policy "tends to affect officer behavior."

Given this evidence, Sgt. Shelton's testimony that he did not tase Blondin *because of* a specific City policy means little. No one contends the City had a policy *requiring* officers to tase non-threatening suspects such that Blondin's tasing could have occurred because a specific policy directed it. Instead, the City's policy told Sgt. Shelton that tasing non-resisting individuals in circumstances like this one was acceptable. It informed him that even a firm grip entails

more force than a taser and deputized him with the power to tase an individual who presents no threat at all. A reasonable factfinder could look at this incident, in which Sgt. Shelton acted in accordance with a policy he claims never to have departed from, and conclude that such policy was the moving force behind his use of the taser in this case.

The Blondins alternatively allege that the City should be held liable for ratifying Sgt. Shelton's unconstitutional conduct. "[A] local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)); *see also Praprotnik*, 485 U.S. at 127 ("If [] authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.").

In a footnote, the district court found it unnecessary to reach the Blondins' ratification-based *Monell* claim "because the City readily admits that its policy classifies the taser as a low level of force." It is unclear why the district court thought this admission would impact the ratification argument, which is not based on the City's taser policy. Because the two theories of liability are different, after rejecting the first the court should have proceeded to consider the second. Both remain available to the Blondins on remand.

## B.  Unlawful Arrest

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012) (en banc) (citation and internal quotation marks omitted). "Probable cause exists if the arresting officers 'had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe that [the arrestee] had committed or was committing a crime.'" *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012) (quoting *United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir. 1990)).

Blondin was arrested under the following provision of Washington law: "A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." Wash. Rev. Code § 9A.76.020(1). The district court concluded that Sgt. Shelton had probable cause to arrest Blondin because he failed to back away when ordered to do so.

Defendants' motion for summary judgment before the district court addressed the Blondins' unlawful arrest claim only in a footnote, urging that the same qualified immunity arguments offered with regard to excessive force should apply to the unlawful arrest claim, as well. In granting Defendants' motion, the district court erroneously treated the Blondins' unlawful arrest claim as a common law "false arrest" claim. Within that framework, and applying state law, it determined that there was probable cause for the arrest. We disagree.

The obstruction statute under which Blondin was arrested has four elements: "(1) an action or inaction that hinders, delays, or obstructs the officers; (2) while the officers are in the midst of their official duties; (3) the defendant knows the officers are discharging a public duty; (4) the action or inaction is done knowingly." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009) (citing Wash. Rev. Code § 9A.76.020). The dispute here centers on the first element—namely, whether officers had probable cause to believe Blondin had engaged in an action or inaction that hindered, delayed, or obstructed the officers.[10]

In *Lassiter*, we considered an obstruction arrest made by officers responding to a domestic violence call with information that the suspect had threatened to cut his wife's throat. *Id.* When officers asked the suspect to sit down so that they could keep him away from possible weapons and ensure the alleged victim's safety, he refused to sit and then grabbed the arm of an officer who tried to guide him to a chair, at which point the officer "pushed him to the floor and handcuffed him." *Id.* at 1051. Because the suspect's behavior involved "[m]ore than just a momentary noncompliance with police orders," "made it impossible for the police to carry out their duty," and "had the practical effect of precluding the officers from securing the scene and investigating a possible assault," we determined there was probable cause to arrest him for obstruction. *Id.* at 1053.

---

[10] The Blondins also contend that Sgt. Shelton lacked probable cause as to the fourth element, urging that a 1994 amendment to the obstruction statute added a specific intent requirement and there was no basis for suspecting Blondin had such specific intent. But the Washington Supreme Court foreclosed this argument when it held that the 1994 amendment did not change the statute's mens rea requirement. *Bishop v. City of Spokane*, 173 P.3d 318, 321 (Wash. 2007).

In reaching that conclusion, we found it helpful to distinguish a prior case, *MacKinney v. Nielson*, 69 F.3d 1002 (9th Cir. 1995). *See Lassiter*, 556 F.3d at 1053. In *MacKinney*, the plaintiff was writing messages critical of the police on a public sidewalk using sidewalk chalk when an officer ordered him to stop writing. 69 F.3d at 1004. Before stopping, he proceeded to underline the last phrase of his message. *Id.* We held there was no probable cause to arrest MacKinney for obstruction for that momentary noncompliance. *Id.*

The district court's finding of probable cause in this case relies heavily on *State v. Lalonde*, 665 P.2d 421 (Wash. 1983).[11] There, officers responding to a complaint of a loud party became involved in physical altercations with underage partygoers. *Id.* at 423. Lalonde approached an officer to "try to talk to him and calm things down." *Id.* Though Lalonde "was told several times to get back, and was physically forced back when he approached the officers, he continued to reapproach and persisted in his attempt to 'keep things calm.'" *Id.* He was then arrested for obstruction. *Id.* Affirming Lalonde's conviction, the Washington Supreme Court held that a person's knowledge that an officer was attempting to arrest someone, and their subsequent act of "reapproaching and conversing with the officer," could be considered obstruction. *Id.* at 426. The court emphasized that Lalonde had admitted he was attempting to get the officers to stop what they were doing and made clear that his

---

[11] Beyond key factual differences, *Lalonde* involved a criminal appeal from an obstruction conviction, so the Washington Supreme Court was interpreting the evidence in the light most favorable to the government, contrary to our review here. *Lalonde*, 665 P.2d at 425.

obstruction was in "the acts which accompanied his words." *Id.*

Here, in contrast, Blondin did not continue to reapproach after he was ordered to stop and get back. He did not persist in inquiring after his neighbor, and there is no evidence that he was attempting to get the officers to stop what they were doing. He engaged in none of the acts *Lalonde* found obstructionist; instead, like the plaintiff in *MacKinney*, Blondin failed to comply "for only a few seconds." *MacKinney*, 69 F.3d at 1006. A genuine issue of fact therefore remains as to whether there was probable cause to arrest Blondin for obstruction, and, as a result, whether doing so violated his constitutional rights.

Because the district court analyzed unlawful arrest as a state law claim, it failed to consider qualified immunity or *Monell* liability and should do so on remand. *See Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010) (declining to reach qualified immunity because it was not addressed by the district court); *Burke v. Cnty. of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009) (remanding for district court to examine *Monell* liability in the first instance).

## C. Common Law Claims

We turn now to the Blondins' common law claims for malicious prosecution and outrage. A malicious prosecution claim has five elements under Washington law: (1) the defendant instituted or continued a prosecution against the plaintiff; (2) without probable cause; (3) with malice; (4) the prosecution terminated in the plaintiff's favor; and (5) the plaintiff was injured or damaged as a result of the prosecution. *Lassiter*, 556 F.3d at 1054 (citing *Clark v.*

*Baines*, 84 P.3d 245, 248–49 (Wash. 2004)). The parties dispute only the second element—the basis on which the district court granted summary judgment. *See Hanson v. City of Snohomish*, 852 P.2d 295, 298 (Wash. 1993) (probable cause is a defense to the tort of malicious prosecution). Having concluded that Sgt. Shelton may have lacked probable cause to arrest Blondin, we reverse the grant of summary judgment in favor of Defendants on the malicious prosecution claim.

Washington's "outrage" tort provides a cause of action for conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003) (quoting *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975)) (internal quotation marks omitted). To prove outrage, a plaintiff must establish "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Id.* "Although the three elements are fact questions for the jury, th[e] first element of the test goes to the jury only after the court 'determine[s] if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability.'" *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002) (quoting *Dicomes v. State*, 782 P.2d 1002, 1013 (Wash. 1989)).

The district court granted summary judgment to Defendants because Ms. Blondin failed to show that (1) she was particularly susceptible to emotional distress and that Sgt. Shelton knew as much, and (2) Sgt. Shelton knew she could observe him tasing her husband. These conclusions are incorrect.

The Washington Supreme Court addressed "unique susceptibility" as a relevant inquiry in *Contreras v. Crown Zellerbach Corp.*, 565 P.2d 1173 (Wash. 1977), an outrage case based on racial discrimination, slurs, and comments. *Id.* at 1174. *Contreras* explained that the defendants "knew or should have known that by reason of [the plaintiff's] Mexican nationality and background he was particularly susceptible to emotional distress as a result of [their] conduct." *Id.* at 1177. The plaintiff was not required to show any particular susceptibility, beyond his status as a racial minority, to establish that defendants should have known that racially derogatory behavior would cause him emotional distress. Here, Ms. Blondin was uniquely susceptible to emotional distress in observing the tasing of her husband by virtue of being his wife. There are sufficient facts—including Sgt. Shelton's threat to Ms. Blondin after tasing her husband, which indicates an awareness on his part that the two were a pair—to establish that Sgt. Shelton knew or should have known that Ms. Blondin was susceptible to emotional distress as a result of observing the tasing of her husband.

In determining that the Blondins failed to establish that Sgt. Shelton knew Ms. Blondin was in the vicinity and could observe her husband's tasing, the district court improperly resolved a fact question in Sgt. Shelton's favor. It explained that "[o]ne of the officers testified during his deposition that [Ms. Blondin] was still on her own property when the officers handcuffed [Blondin]." This statement falls far short of establishing whether Ms. Blondin was close enough to see the tasing, or whether Sgt. Shelton knew as much. That after threatening Blondin with further tasing Sgt. Shelton turned to Ms. Blondin, warning that she was "next," certainly suggests she was close enough to observe the incident, and that Sgt. Shelton knew exactly where she was. Whether this incident

was "extreme and outrageous" is for a factfinder to determine.

## IV.  CONCLUSION

In light of the foregoing, we reverse the grant of qualified immunity to Sgt. Shelton and the grant of summary judgment to the City on the Blondins' excessive force claim.  We also reverse the district court's grant of summary judgment based on the determination that probable cause existed for Blondin's arrest, and we remand for further proceedings on the unlawful arrest claim.  Finally, we reverse the grant of summary judgment on the Blondins' common law claims.

**REVERSED AND REMANDED.**

---

NGUYEN, Circuit Judge, dissenting:

The majority goes badly astray because it loses sight of the specific context of this case and employs hindsight rather than viewing the scene through the eyes of a reasonable officer.  Blondin interjected himself into a rapidly-evolving, highly volatile scene: officers struggling to restrain a combative, armed man in the process of trying to take his own life.  At the time Blondin was tased, two loaded firearms were unsecured.  Yet, at every turn, the majority attempts to minimize the precariousness of the situation, thinly splicing the facts to assess Blondin's conduct—and the reasonableness of the officers' response—in a vacuum.  It is one thing to resolve disputed facts and inferences in Blondin's favor.  But the majority goes well beyond this by choosing to ignore *undisputed* facts which do not favor Blondin's case.  By

discounting the danger and abstracting the qualified immunity inquiry, the majority's approach fails to accord appropriate deference to an officer's reasonable judgment exercised under exigent circumstances.  Because the majority fails to follow the Supreme Court's dictate to assess the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]" *Graham v. Connor*, 490 U.S. 386, 396 (1989), I respectfully dissent.

## I.

## A.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2085 (2011).   The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In evaluating whether a constitutional right was clearly established at the time of the conduct, the Supreme Court has instructed us to ask whether its contours were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   While "[w]e do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

In applying the "clearly established" rule, we must be careful to "faithfully guard[] 'the need to protect officials who are required to exercise their discretion and the related

public interest in encouraging the vigorous exercise of official authority.'" *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (en banc) (quoting *Harlow*, 457 U.S. at 807). "We must also allow 'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 396–97).

## B.

Was the law sufficiently clear on the evening of May 4, 2008 such that any reasonable officer would have known that tasing Blondin for two seconds was an excessive use of force in light of the specific circumstances? I think not.

For starters, consider the undisputed facts. Officers responded to a 911 call regarding a suicide-in-progress. Suicide calls are dangerous, as a suicidal suspect can quickly become homicidal. Any officer attempting to stop someone in the process of committing suicide faces a risk that the suspect will try to take out others along with him, or choose to "go out in a blaze of glory" and open fire in the hope that he will be gunned down by return fire (known colloquially as "suicide-by-cop"). Here, moreover, the officers had been specifically warned by the person who called 911 (a family member of the suicidal man, Jack Hawes) that Hawes owned a gun and would have it with him.

When the officers arrived, they observed Hawes sitting in his vehicle, running an exhaust pipe into one of the windows. They couldn't see his weapon. Hawes complied with their orders to step out of the vehicle, but refused to obey orders to

show his hands. A scuffle ensued as the officers attempted to restrain, locate his weapon, and secure him.

Enter Blondin. Wearing shorts and slippers, Blondin suddenly approached the scene, yelling "What are you doing to Jack?" (Note the accusatory phrasing of this question: not "What's going on here?" or "Is everything alright, officers?" but "What are *you doing* to Jack?") Blondin's presence and question signaled to the officers that (1) Blondin was not a random passerby, but someone who had come out of his house to see what was going on; (2) Blondin knew the suspect on a first name basis; and (3) Blondin was concerned that the officers were "doing" something to his friend/neighbor.

The parties dispute how far Blondin was standing from the fray, but accepting Blondin's view (as we must), he was thirty-seven feet away from where Hawes was struggling with the officers. This is not terribly far; to put it in perspective, thirty-seven feet is little more than half the distance between the pitcher's mound and home plate.[1] During his deposition (and again in a declaration) Blondin recounted how, in response to his question about what they were doing to Jack, an officer yelled at him to "get back."[2] According to a

---

[1] *See* Major League Baseball, http://mlb.mlb.com/mlb/official_info/ baseball_basics/on_the_field.jsp# (last visited Aug. 15, 2013) (distance between the pitcher's mound and home plate is 60 feet, 6 inches).

[2] Although there is some evidence in the record indicating that one officer also yelled at Blondin to stop, nothing in Blondin's deposition testimony or declaration indicates that he heard this order and tried to comply, or even that he was confused about whether to stop or get back. Rather, Blondin concedes that he knew he was ordered to "get back" but explained that he failed to comply because: "I don't know why.…I tried

passerby who testified on Blondin's behalf, officers ordered Blondin to get back five or six separate times. Yet, for approximately fifteen seconds, Blondin stood inexplicably "frozen," refusing to comply with officers' orders. The majority dismisses this as a mere "momentary failure to move[,]" slip op. at 15, but fifteen seconds is a long time to remain motionless when multiple police officers are yelling at you to retreat. (Try counting to fifteen one-thousand out loud, and see for yourself.)

Although the majority makes much of a passerby's testimony that, in his opinion, Blondin was frozen "with fear," slip op. at 9, Blondin did nothing that would objectively convey to the officers why he was refusing to back away. View the scene from a reasonable officer's perspective, as the Supreme Court tells us we must: officers were in the midst of tense, rapidly-evolving circumstances, trying to restrain a combative suicidal man with an unsecured firearm. One of the officers, Deputy Bowman, had his back facing the direction in which Blondin was approaching, with a loaded, unsecured rifle slung on his back. Suddenly, a man who knew the suspect purposely interjected himself into the scene, demanded to know what was going on, and refused to comply with repeated commands to retreat—even when warned that he would be tased if he didn't do so.

Even if we assume that Sgt. Shelton's use of force was excessive, why wasn't his mistake reasonable? What precedent existed in May 2008 such that every reasonable officer would have understood that it was unlawful to tase

---

to make my feet move. I tried to get out of there, it just didn't work." Moreover, it is undisputed that Blondin was ordered to "get back" multiple times *after* the purportedly contradictory command to stop.

Blondin for two seconds under these circumstances?  Which case placed this constitutional question "beyond debate" in 2008?  *al-Kidd,* 131 S. Ct. at 2083.  I don't know.  Nor is it evident from the majority's opinion, which, rather than squarely addressing these questions, re-frames the inquiry instead.

The issue here, the majority says, is whether "the right to be free from non-trivial force for engaging in mere passive resistance was clearly established prior to 2008."  Slip op. at 12; *see also* slip op. at 3 ("We must decide whether it was clearly established as of 2008 that the use of a taser in dart mode against a passive bystander amounts to unconstitutionally excessive force within the meaning of the Fourth Amendment.").  This formulation is wrong in two respects.  First, it contravenes the Supreme Court's instruction that the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  Indeed, the Court has expressly taken us to task for failing in this regard.  *See al-Kidd*, 131 S. Ct. at 2084 ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (internal citations omitted).[3]  I recognize that the inquiry need not be so narrowly defined as to allow

---

[3] There may be an exception to this rule: When "the defendant's conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001) (citation, internal quotation marks, and alteration omitted).  However, the majority does not appear to contend that this case is so patently egregious such that officers required no specific guidance from caselaw.

the officers to "define away all potential claims." *Nelson v. City of Davis*, 685 F.3d 867, 883–84 (9th Cir. 2012) (quoting *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995)). However, by analyzing whether Blondin's right was clearly established without reference to the specific factual context, the majority not only brushes off the Supreme Court's instructions, it departs from the same cases upon which it goes on to rely. *See, e.g., See Nelson v. City of Davis*, 685 F.3d 867, 884 (9th Cir. 2012) ("All that remains is to determine whether the law was sufficiently clearly established that a reasonable officer would have been on notice that the use of pepperball projectiles directed towards [the plaintiff] and his friends was unreasonable under the circumstances."); *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (concluding that "it would be clear to a reasonable officer that using pepper spray against the protestors was excessive under the circumstances").

Second, as I've already suggested, the majority's factual characterization is somewhat misleading. Blondin, for example, was not a simply a "passive bystander[,]" slip op. at 3—he came out of his house in slippers, demanding to know what the officers were "doing to Jack." Likewise, describing Blondin's conduct as a "total lack of resistance," slip op. at 18, obscures the undisputed fact that Blondin repeatedly failed to comply with officers' orders to retreat. While the majority emphasizes that Blondin was initially given a "contradictory" order to stop, slip op. at 10; *see also* slip op. at 15, Blondin's own testimony refutes the majority's supposition that he froze in an effort to comply, or out of confusion. Dismissing Blondin's non-compliance as "mere passive resistance" also unfairly imports the benefit of hindsight; in the heat of the moment, Sgt. Shelton *didn't know* whether Blondin's resistance was going to be "merely"

passive, or whether Blondin was going to suddenly bolt in Hawes's direction. In this sense, the majority's post-hoc confidence in Blondin's passivity undercuts the very point of the inquiry: whether, under the circumstances, an officer could have reasonably interpreted Blondin's inexplicable non-compliance as a threat.

Lastly, even if the majority is correct that we may look to cases which do not involve tasers, slip op. at 13, framing our inquiry in terms of "non-trivial force" still paints with too broad a brush. All "non-trivial force" is not created alike. Here, specifically, the majority employs "non-trivial force" to mean tasing someone for two seconds in dart mode. But "non-trivial force" also covers, among other things, firing a lead-filled beanbag round into someone's face with enough force to gouge out their eye, fracture their cranium, and leave a lead shot embedded in their skull. *See Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001). Any reasonable officer might know that the constitution would prohibit firing a lead-filled beanbag round into Blondin's face from short range. But tasing him for two seconds? That's a much closer call. Thus, in my view, asking whether law regarding the use of "non-trivial force" was clearly established is not a fair benchmark by which to gauge an reasonable officer's understanding of the legality of his actions.

Moreover, I fail to see how the cases relied upon by the majority made the "contours [of Blondin's right] sufficiently clear that every reasonable official would have understood that what [Sgt. Shelton did] violated that right." *Mattos*, 661 F.3d at 442 (citation and internal quotation marks omitted). While precedent need not be squarely on all fours, *see al-Kidd*, 131 S. Ct. at 2083, we nevertheless require

"*closely analogous* pre-existing case law" to show that the law is clearly established. *Deorle*, 272 F.3d at 1275 (emphasis added).

Here, the cases which the majority concludes set forth clearly established law are far from closely analogous. To wit, it relies upon: (1) *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), in which an officer shot a college student in the eye with a pepperball projectile without any warning, causing him multiple surgeries, permanent eye injuries, and ultimately the loss of his college scholarship, where the student did not disobey police orders (which weren't even given until after the projectile was shot), but was merely part of a large party that police were trying to break up, *id.* at 873–74, 881; (2) *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), which involved an officer who—again, without warning—fired a lead-filled beanbag round into the face of an unarmed suicidal man who had complied with officers' instructions, resulting in the loss of the man's left eye and other serious injuries, *id.* at 1285–86; (3) *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002), in which officers sprayed peaceful protestors in the face with pepper spray from a few feet away, forcibly pried open protesters' eyes, and stuck in Q-tips containing pepper spray, *id.* at 1128–29; and (4) *Casey v. City of Fed. Heights*, 509 F.3d 1278 (10th Cir. 2007), a Tenth Circuit case in which a plaintiff who was peacefully returning to the courthouse (where he had unsuccessfully challenged a traffic ticket) with a file he should not have removed "had his shirt torn, and then [was] tackled, Tasered, knocked to the ground by a bevy of police officers, beaten, and Tasered again, all without

warning or explanation[,]" *id.* at 1285.**[4]** I strongly disagree with the majority's conclusion that, in light of this precedent, every reasonable officer would know that tasing Blondin for two seconds under the circumstances presented constituted excessive force. *See Mattos*, 661 F.3d at 448.

One final point. In three recent cases involving the use of tasers in dart mode, we granted officers qualified immunity upon concluding that the law was not sufficiently clear as of 2005 and 2006 to render the alleged constitutional violations clearly established. *See Mattos v. Agarano*, 661 F.3d 433, 452 (9th Cir. 2011) (en banc); *Brooks v. City of Seattle*, reviewed jointly with *Mattos*, 661 F.3d at 443–48; *Bryan v. MacPherson*, 630 F.3d 805, 833 (9th Cir. 2010). And, as the district court correctly recognized, "[b]y May 2008, the state of the law in this circuit was no clearer; no Supreme Court or Ninth Circuit opinion was issued in the interim." The majority nevertheless asserts that *Mattos*, *Brooks,* and *Bryan* are distinguishable in "one critical respect: Blondin engaged in no behavior that could have been perceived by Sgt. Shelton as threatening or resisting." Slip op. at 14. This assertion, however, is not only shaded with the benefit of hindsight, it is inconsistent with undisputed facts in the record. Blondin *did* engage in behavior that could have objectively been perceived as resisting, if not threatening: for fifteen seconds he refused to comply with officers' repeated orders to back away from a dangerous, volatile scene. Accordingly, Blondin's purported lack of resistance cannot justify departing from the holdings in *Mattos*, *Brooks*, and *Bryan*.

---

**[4]** The majority also mentions other out-of-circuit taser cases in a footnote, slip op. at 13–14, n.6, for purposes of distinguishing them from taser cases in our circuit. It does not, however, appear to rely on these cases as support for its conclusion that the law was clearly established.

\*\*\*\*\*

In sum, I believe that the law did not clearly establish that Sgt. Shelton's conduct violated Blondin's constitutional rights. I therefore would affirm the district court's holding that the officers are entitled to qualified immunity on Blondin's excessive force claim.

## II.

The same errors which permeate the majority's analysis of Blondin's excessive force claim also taint its discussion of Blondin's claims for unlawful arrest and malicious prosecution. To succeed on both of these claims, Blondin must establish the absence of probable cause. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012) (en banc) ("A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was *without probable cause* or other justification.") (citation omitted) (emphasis added); *id.* at 919 ("To claim malicious prosecution, a petitioner must allege that the defendants prosecuted her with malice and *without probable cause*, and that they did so for the purpose of denying her equal protection or another specific constitutional right.") (citation and internal quotation marks omitted) (emphasis added).

Blondin was arrested for obstruction under a Washington statute providing that "a person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020. Whether there was probable cause to arrest Blondin for violating this statute is a far easier hurdle to clear than the majority suggests.

In my view, the undisputed facts show that Sgt. Shelton had probable cause to arrest Blondin for obstruction. As the Supreme Court has explained, "it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (citation omitted). Under the totality of circumstances, there was at least a reasonable probability that Blondin's knowing refusal to comply with officers' repeated orders to back away from an active crime scene diverted their attention from performance of their official duties and created a potential safety hazard. A reasonable officer therefore had at least probable cause to believe that Blondin was obstructing the officers' efforts to restrain Hawes and secure his firearm.

Accordingly, I would affirm the grant of summary judgment on both the unlawful arrest and malicious prosecution claims.

### III.

Nor do I agree with the majority that Kristi Gravelet-Blondin's state-law outrage claim should survive summary judgment. To succeed on this claim, the alleged misconduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003) (citation omitted). Factors that courts may consider in conducting this analysis include "the position occupied by the defendant, whether the plaintiff was peculiarly susceptible to emotional distress, the defendant's knowledge of such fact and whether defendant's conduct may have been privileged under the circumstances." *Grimsby v.*

*Samson*, 530 P.2d 291, 295 (Wash. 1975); *see also Spurrell v. Bloch*, 701 P.2d 509, 535 (Wash. Ct. App. 1985).

Taking its cue from the district court, the majority hones in on whether Ms. Blondin was particularly susceptible to emotional distress, and if the defendants knew this fact. Slip op. at 26–28. But even accepting that, as Blondin's wife, Ms. Blondin was "particularly susceptible" to distress upon seeing him tased (and that Sgt. Shelton knew as much), this is still not enough to create a triable issue of fact as to whether the conduct was sufficiently extreme. It is undisputed that Sgt. Shelton tased Blondin for only two seconds following Blondin's refusal to comply with repeated orders. It is also undisputed that immediately after Blondin was tased, officers summoned paramedics to remove the barbs and check his vital signs.[5]

Under the totality of circumstances I believe that no reasonable juror could conclude that Sgt. Shelton's conduct was atrocious, extreme, or beyond all possible bounds of decency. *Grimbsy*, 530 P.2d at 295. Accordingly, I would affirm the district court's grant of summary judgment on Ms. Blondin's common law outrage claim.

## IV.

In sum, I would hold that the officers are entitled to qualified immunity, and that the Blondins' unlawful arrest and common law claims fail as a matter of law. I therefore respectfully dissent.

---

[5] Blondin declined further medical attention.