**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| A. K. H., a minor by and through her Guardian Ad Litem Elizabeth Landeros; MARIA CERDA REYES; BENITO HERRERA; H. H., a minor by and through her Guardian Ad Litem Eloisa Gutierrez; A. H., a minor by and through her Guardian Ad Litem Eloisa Gutierrez; B. H., Jr., a minor by and through his Guardian Ad Litem Eloisa Gutierrez, *Plaintiffs-Appellees*, v. CITY OF TUSTIN; OFFICER VILLARREAL, *Defendants-Appellants.* | No. 14-55184 D.C. No. 8:12-cv-01547-JLS-RNB OPINION |

Appeal from the United States District Court
for the Central District of California
Josephine L. Staton, District Judge, Presiding

Argued and Submitted March 7, 2016
Pasadena, California

Filed September 16, 2016

Before: William A. Fletcher, Mary H. Murguia,
and John B. Owens, Circuit Judges.

Opinion by Judge W. Fletcher

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's denial of qualified immunity to a police officer and remanded in an action brought pursuant to 42 U.S.C. § 1983 alleging that the officer used unlawful deadly force when he shot and killed Benny Herrera during an attempted investigatory stop.

The panel held that the government's interests were insufficient to justify the use of deadly force. The panel noted that the crime at issue was a domestic dispute that had ended before the police became involved, that Herrera did not pose an immediate threat to the safety of the officers or others, that although Herrera did not comply with the officer's commands, he did not attempt to flee, and that the officer escalated to deadly force very quickly and without warning. The panel concluded that viewing the evidence in the light most favorable to the plaintiffs, the intrusion on Herrera's interest substantially outweighed any interest in using deadly force. The panel further held that the officer violated clearly established Fourth Amendment law when he shot and killed Herrera.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

M. Lois Bobak (argued), Robert L. Kaufman, and Daniel K. Spradlin, Woodruff Spradlin & Smart, APC, Costa Mesa, California, for Defendant-Appellant Officer Villareal.

No appearance by Defendant-Appellant City of Tustin.

Dale K. Galipo (argued) and Eric Valenzuela, Law Offices of Dale K. Galipo, Woodland Hills, California, for Plaintiffs-Appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

Defendant Osvaldo Villarreal, a police officer in Tustin, California, fatally shot Benny Herrera during an attempted investigatory stop. As will be more fully described below, Herrera was on foot. Officer Villarreal was in his patrol car and had just driven up beside Herrera. Herrera was in the middle of the roadway, moving in the direction of traffic. His left hand was free and visible; his right hand was in his sweatshirt pocket. Villarreal commanded Herrera to take his hand out of his pocket. Less than a second later, just as Herrera's hand came out of his pocket, Villarreal shot him twice, killing him. Herrera was unarmed. Villarreal does not claim that he saw, or thought he saw, a weapon in Herrera's hand.

In a § 1983 suit alleging excessive force, Officer Villarreal moved for summary judgment. The district court denied the motion. In this interlocutory appeal, we affirm.

I.  Factual and Procedural Background

On December 17, 2011, at approximately 3:00 p.m., Hilda Ramirez called 911.  She reported that her ex-boyfriend, Benny Herrera, had "jacked [her] phone."  Ramirez stated that she was not hurt, that she did not need paramedics, and that her children were "fine."  Initially, Ramirez told the 911 police dispatcher that Herrera stole her phone by "just grabb[ing] it from [her] hand."  A short time later, Ramirez modified her story and said that, while the two were arguing about her phone, Herrera "did end up hitting [her] in the head."

Ramirez told the police dispatcher that Herrera had not used a weapon to take her phone, that Herrera did not carry any weapons, and that Herrera had never been violent with her before.  Ramirez told the dispatcher that Herrera was "walking down El Camino Real . . . towards Red Hill."  She explained that because he did not have a car and had no friends in the area, Herrera was probably trying to a catch a bus back to his home.

The dispatcher sent out a general call to Tustin police officers.  The dispatcher initially reported:

> [A] DV [domestic violence] just occurred . . . The RP [reporting party] states her ex-boyfriend, Benny Herrera, male Hispanic, 31 years, 5'8", thin build, bald head, black hooded sweatshirt was inside her apartment, took her cell phone, he left.  He is now walking on ECR [El Camino Real] towards Red Hill.

The dispatcher repeated Ramirez's report, saying that Herrera was heading down El Camino Real "to catch the bus" because he had "no access to a vehicle and no friends in the area." After Ramirez modified her story, the dispatcher updated the officers, explaining that "originally the RP claimed that there was no physical violence, now she's claiming that the male subject hit her in the head." The dispatcher reported that Herrera "is not known to carry weapons." She also reported that Herrera was "shown in-house to be a member of the Southside Gang" and that there was possibly a $35,000 traffic warrant out for Herrera's arrest. The dispatcher reported, further, that Herrera was on "parole for 11350," a reference to a state drug possession crime. *See* Cal. Health & Safety Code § 11350.

Driving a large police SUV, Officer Brian Miali was the first to spot Herrera. As Ramirez had reported, Herrera was walking down El Camino Real. A video taken by Miali's dashboard camera shows Herrera walking on the right shoulder of the road in the same direction as traffic. On Herrera's immediate right was a high wall, preventing him from escaping to the right. As he came up to Herrera, Miali turned on the red lights of his SUV. Herrera put his right hand in his sweatshirt pocket and started alternately to skip, walk, and run backwards facing Miali. As Herrera did so, he moved away from the right shoulder toward the middle of the road. Miali drew his gun and opened his driver's side door while driving forward slowly. Herrera kept ahead of Miali's SUV, sometimes at distances of less than ten or fifteen feet. Using the loudspeaker of his SUV, Miali told Herrera three times to "get down." Herrera did not comply. He stayed on his feet and continued to move down the road at about the same speed as Miali's SUV.

Officer Villarreal was driving on El Camino Real behind Officer Miali. A civilian sedan was directly behind Miali, separating Miali from Villarreal's vehicle. Villarreal testified in his deposition that he did not hear Miali tell Herrera to "get down." The civilian car moved onto the shoulder to the right, and Villarreal moved left into the opposite lane. He drove his patrol car up beside Herrera, and slightly forward of Miali's SUV, in order to "box" Herrera in and cut off his avenue of escape. Villarreal held his gun in his hand. His front passenger window was open. The video taken by Miali's dashboard camera shows that Herrera was already moving to the left, toward Villarreal's patrol car, as Villareal pulled up beside Herrera. Villareal immediately shouted, "Get your hand out of your pocket." Herrera removed his right hand from his sweatshirt pocket in an arcing motion over his head. Just as Herrera's hand came out of his pocket, Villarreal fired two shots in rapid succession. Villarreal did not give any warning that he would shoot, and Officer Miali later stated that he was not expecting the shots. Both officers admitted that they never saw anything in either of Herrera's hands.

Officer Villarreal testified in his deposition that he shot Herrera because he "believe[ed] that he had a weapon and he was going to use that weapon on [him]." Villarreal testified that Herrera's right hand was "concealed" in his sweatshirt pocket." Miali testified in his deposition that "there was something in there that appeared to be heavy." Villarreal testified that Herrera "charged [him] or shortened the distance or closed the distance at [his] passenger window very quickly." Villarreal said that probably "three to five seconds" passed between when he commanded Herrera to remove his hands from his pocket and when he shot. The recording from Villarreal's dashboard camera, however, shows that the command and the shots were almost simultaneous, separated

by less than a second. The total elapsed time from when Miali first encountered Herrera to when Villarreal shot him was less than a minute.

It is undisputed that Herrera was unarmed. Ramirez had reported to the police dispatcher that Herrera did not carry weapons. The dispatcher had reported to the officers that Herrera "is not known to carry weapons." The only "heavy" object in Herrera's sweatshirt pocket was a cell phone.

Relatives of Herrera ("Plaintiffs") filed suit under 42 U.S.C. § 1983 against Officer Villarreal and the City of Tustin alleging, *inter alia*, that Villarreal used excessive force against Herrera. Villarreal moved for summary judgment based on qualified immunity. The district court denied the motion. Villarreal brought an interlocutory appeal.

## II. Appellate Jurisdiction

The parties dispute whether we have jurisdiction to hear this interlocutory appeal. A denial of summary judgment is not ordinarily appealable because it is not a "final decision." *See 2*8 U.S.C. § 1291; *Plumhoff v. Rickard*, 572 U.S. —,134 S. Ct. 2012, 2018 (2014). However, there is an exception to the final judgment rule for an appeal denying a motion for summary judgment based on qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

When analyzing an appellate court's jurisdiction over an appeal from a denial of a motion for summary judgment based on qualified immunity, the Supreme Court distinguishes between "factual" and "legal" questions. We have jurisdiction over "legal" but not "factual" interlocutory appeals. *Plumhoff*, 134 S. Ct. at 2019; *Behrens v. Pelletier*,

516 U.S. 299, 313 (1996); *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

Officer Villarreal argues that, even viewing the evidence in the light most favorable to the plaintiffs, his actions did not violate the Fourth Amendment and that the district court therefore erred in denying him qualified immunity. A defendant who appeals a denial of qualified immunity on the ground that his "conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law" has "raise[d] legal issues" that may be properly heard in an interlocutory appeal. *Plumhoff*, 134 S. Ct. at 2019; *see also Behrens*, 516 U.S. at 312–13. Villarreal has brought such an appeal, and we have jurisdiction.

## III.  Standard of Review

In reviewing a summary judgment ruling, "we assume the version of the material facts asserted by the non-moving party to be correct." *Jeffers v. Gomez*, 267 F.3d 895, 905 (9th Cir. 2001) (emphasis omitted) (quoting *Schwenk v. Hartford*, 204 F.3d 1187, 1195 (9th Cir. 2000)). We review "de novo the district court's determination regarding qualified immunity." *Deorle v. Rutherford*, 272 F.3d 1272, 1278 (9th Cir. 2001).

## IV.  Discussion

To determine whether Officer Villarreal is entitled to summary judgment based on qualified immunity, we ask two questions. First, viewing the facts in the light most favorable to the plaintiffs, did Villarreal use excessive force in violation of the Fourth Amendment? *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010). Second, if Villarreal used excessive

force, did he violate a clearly established right? *Id.* We address each question in turn.

## A. Excessive Force

We analyze excessive force claims under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citation omitted). To determine the reasonableness of an officer's actions, we "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner*, 471 U.S. at 8 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)) . We evaluate "the totality of the circumstances," *id.* at 9, paying careful attention to factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "most important" of these factors is "whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)). Deadly force is permissible only "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Garner*, 471 U.S. at 11.

The "nature and quality of the intrusion" by Officer Villarreal on Herrera's Fourth Amendment interests was extreme. *Id.* at 8. "The intrusiveness of a seizure by means of deadly force is unmatched." *Id.* at 9. The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a "fundamental interest in his own life" and because such force "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Id.*

The government's interests were insufficient to justify the use of deadly force. First, the "crime at issue," *Graham*, 490 U.S. at 396, was a domestic dispute that had ended before the police became involved. We recognize that some domestic disputes can pose a serious danger to police officers and others, *see Mattos*, 661 F.3d at 450, but we have held that domestic disputes do not necessarily justify the use of even intermediate let alone deadly force. For example, we denied qualified immunity in *Smith* to officers who used pepper spray and a dog to subdue and arrest a suspect, even though the suspect was reported to have "hit[]" or become "physical" with his wife. *Smith*, 394 F.3d at 702–03. The use of force is especially difficult to justify when "the domestic dispute is seemingly over by the time the officers begin their investigation." *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (denying qualified immunity in an excessive force case partly because the victim of the domestic disturbance "was unscathed and not in jeopardy when deputies arrived"); *Smith*, 394 F.3d at 702–03 (denying qualified immunity partly because, by the time the officers arrived, the suspect "was standing on his porch alone and separated from his wife"). Here, when the officers came upon Herrera, he had left Ramirez's apartment and was walking down a road at some distance from the apartment.

Second, Herrera did not "pose[] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. It is clear that the domestic altercation was over, and that Herrera posed no current threat to the safety of Ramirez. She had told the police dispatcher that Herrera had taken her phone, had hit her on the head, and had left on foot to catch a bus. It is also clear in retrospect that Herrera posed no threat to the safety of the officers, as he in fact had no weapon; but the relevant question for purposes of qualified immunity is whether Officer Villarreal could reasonably have believed that Herrera posed such a threat. Viewing the evidence in the light most favorable to Plaintiffs, we conclude that he could not.

When Officer Miali first arrived on the scene, Herrera was walking on the right-hand shoulder of the road. The officers had little, if any, reason to believe that Herrera was armed. Ramirez had told the police dispatcher that Herrera was not carrying any weapons, and the dispatcher had told the officers that Herrera was "not known to carry weapons." When Miali started following Herrera in his SUV, Herrera put his right hand in the pocket of his sweatshirt. He then alternated among skipping, walking, and running, mostly facing backward toward Miali, without displaying a weapon. Villarreal admitted that he never saw a weapon.

We recognize that the dispatcher had told the officers that Herrera was a member of the "Southside Gang," may possibly have had a $35,000 traffic warrant, and was on parole for a drug possession conviction. Further, the officers had been told that Herrera had stolen Ramirez's cell phone and hit her on the head, and had had prior run-ins with law enforcement, including at least one conviction. But the traffic warrant and drug possession conviction were relatively minor

crimes, neither of which entailed violence or gun possession, and the dispatcher's information included a statement that Herrera was not known to be armed.

Third, even if Herrera was "actively resisting" or "attempting to evade" an investigatory stop, and even if we equate for present purposes an arrest and an investigatory stop, this factor only slightly favors the government. *Graham*, 490 U.S. at 396; *see also Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994). Herrera did not stop as soon as he saw the red lights on Officer Miali's SUV, and he did not comply with the officer's commands to "get down." Herrera, however, never attempted to cross the road and flee, and he continued to move at about the same speed as Officer Miali, while facing him much of the time. Nor did Villareal actually hear Miali tell Herrera to "get down." Viewing the evidence in the light most favorable to Herrera, this factor does not weigh heavily in the government's favor in determining whether the amount of force used was justified. *See Deorle*, 272 F.3d at 1280 (describing the *Graham* factors as "simply a means by which to determine objectively 'the amount of force that is necessary in a particular situation'" (quoting *Graham*, 490 U.S. at 396–97)).

Finally, and perhaps most important, Officer Villarreal escalated to deadly force very quickly. Villarreal commanded Herrera to take his hand out of his pocket immediately upon driving up beside him. Villarreal then shot Herrera just as he was taking his hand out of his pocket. Less than a second elapsed between Villarreal commanding Herrera to take his hand from his pocket and Villarreal shooting him. Villarreal neither warned Herrera that he was going to shoot him, nor waited to see if there was anything in Herrera's hand. In total, less than a minute had elapsed

between when Miali first came upon Herrera and when Villarreal shot him.

Roger Clark, a twenty-seven year veteran of the Los Angeles Police Department, submitted an expert witness declaration. Clark concluded that the "use of deadly force by Officer Villarreal against Mr. Herrera was excessive and unreasonable." The reasons supporting his conclusion included that "[t]here was no serious crime reported"; "[t]here was no indication that a weapon was involved"; "[t]he dispatch information to the officers was that the suspect was not known to carry weapons"; "Mr. Herrera was only being detained, not arrested"; "Mr. Herrera complied with Officer Villarreal's command to take his hand out of his pocket"; "[w]hen Mr. Herrera took his hand out of his pocket upon request, there was nothing in his hand"; "Officer Villarreal conceded that he never saw a gun or anything that looked like a gun in Mr. Herrera's hand"; "Officer Villarreal gave no warning that he was going to shoot"; "Mr. Herrera never verbally threatened the officers"; and "Officer Villarreal had other reasonable options."

Based on the totality of circumstances, and balancing the interests of the two sides, *see Garner*, 471 U.S. at 8, we conclude, viewing the evidence in the light most favorable to the plaintiffs, that the intrusion on Herrera's interests substantially outweighed any interest in using deadly force. We therefore conclude, so viewing the evidence, that Officer Villarreal's fatal shooting of Herrera violated the Fourth Amendment.

### B. Clearly Established Right

Although we conclude Officer Villarreal's actions violated the Fourth Amendment, we may affirm the district court's denial of qualified immunity only if "the right which was violated was clearly established at the time of the violation." *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To determine whether Officer Villarreal violated clearly established law, we look to "cases relevant to the situation [Villarreal] confronted," *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (quotation marks omitted), mindful that there need not be a case "directly on point." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Viewing the evidence in the light most favorable to the plaintiffs, we conclude that Villarreal violated clearly established Fourth Amendment law when he shot and killed Herrera.

The Supreme Court's decision in *Garner* is instructive. Neither the crime at issue in *Garner* nor the crime in this case involved the use of serious or deadly force. In *Garner*, the police suspected Garner of committing burglary; here, the officers had been told that Herrera reportedly hit his ex-girlfriend on the head and stole her cell phone. Garner fled from police even though an officer told him to "halt"; Herrera did not comply with Miali's commands to "get down" (although Officer Villarreal had not heard the commands). *Id.* at 4. Most important, viewing the facts in the light most favorable to Plaintiffs, Officer Villarreal in this case had no more reason to suspect that Herrera was armed than did the officer in *Garner*. The officer in *Garner* stated that the suspect "appeared to be unarmed" but that he "could not be

certain that was the case." *Id.* at 20. The Court explained, "Restated in Fourth Amendment terms, this means [the officer] had no articulable basis to think Garner was armed." *Id.* The same is true here. The dispatcher expressly told the officers that Herrera was "not known to carry weapons." Villarreal never saw a gun. He could provide no basis for his belief that Herrera was armed except to say that Herrera had one hand "concealed."

## Conclusion

It has long been clear that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. Viewing the evidence in the light most favorable to the plaintiffs, that is precisely what Officer Villarreal did here. We affirm the district court's denial of qualified immunity and remand for further proceedings consistent with this opinion.

**AFFIRMED and REMANDED.**