**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROSALINA CALONGE, an
individual and successor in interest to
Francis Calonge, deceased,

*Plaintiff-Appellant*,

v.

CITY OF SAN JOSE, a municipal
public entity; EDWARD CARBONI,
an individual,

*Defendants-Appellees*,

 and

FRANCISCO CALONGE, Nominal
Defendant,

*Defendant*.

No.22-16495

D.C. No.
5:20-cv-07429-
NC

OPINION

Appeal from the United States District Court
for the Northern District of California
Nathanael M. Cousins, Magistrate Judge, Presiding

Argued and Submitted November 17, 2023
San Jose, California

Filed June 7, 2024

Before: Mary H. Murguia, Chief Judge, and Richard A. Paez and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland

## SUMMARY[*]

### Deadly Force/Qualified Immunity

The panel reversed the district court's summary judgment granting qualified immunity to City of San Jose Police Officer Edward Carboni in an action brought pursuant to 42 U.S.C. § 1983 alleging, among other claims, that Officer Carboni used excessive deadly force when he shot and killed Francis Calonge.

The panel noted that this case is unusual in that other officers on the scene contradicted key facts asserted by Officer Carboni. Construing the facts in the light most favorable to plaintiff Rosalina Calonge, the panel concluded that a reasonable jury could decide that Officer Carboni violated Calonge's Fourth Amendment right to be free from excessive force. The panel resolved three disputed facts in plaintiff's favor for purposes of the appeal: (1) Calonge was not drawing his gun or otherwise making a threatening gesture when Officer Carboni shot him; (2) there were no bystanders in Calonge's vicinity when he was shot; and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

(3) officers did not instruct Calonge to get on the ground or otherwise stop. The totality of the circumstances did not justify deadly force. A reasonable jury could conclude that Calonge did not pose an immediate threat and was not fleeing arrest. Officers were not responding to the commission of a serious crime, and Calonge was not non-compliant, given the officers' conflicting commands about what to do with the gun.

It would have been clear to a reasonable officer in Carboni's position at the time that shooting Calonge was unlawful. It was clearly established that when a man is walking down the street carrying a gun in his waistband, posing no immediate threat, police officers may not shout conflicting commands at him and then kill him.

## COUNSEL

James McManis (argued), Abimael Bastida, and Isaac D. Nieblas, McManis Faulker, San Jose, California, for Plaintiff-Appellant.

Thomas J. Gray (argued), Senior Deputy City Attorney; Ardell Johnson, Assistant City Attorney; Nora Frimann, City Attorney; San Jose City Attorney's Office, San Jose, California; for Defendants-Appellees.

**OPINION**

FRIEDLAND, Circuit Judge:

We are presented here with a police officer's assertion of qualified immunity after shooting and killing Francis Calonge. Several officers responded to 911 calls reporting a man with a gun. They located the man, thirty-three-year-old Calonge, who had what appeared to be a gun in his waistband. They followed him for about one minute as he walked down a street. Officer Edward Carboni then shot and killed Calonge. Calonge's mother, Rosalina Calonge, sued Officer Carboni for violating her son's Fourth Amendment right to be free from excessive force.[1]

This case is unusual in that other officers on the scene contradict key facts asserted by the officer who used deadly force. Construing the facts in the light most favorable to Ms. Calonge, we conclude that a reasonable jury could decide that Officer Carboni violated the Fourth Amendment. We also conclude that the relevant law was clearly established at the time, so Officer Carboni is not entitled to qualified immunity. We accordingly reverse the district court's grant of summary judgment in his favor.

---

[1] Ms. Calonge also brought other claims, which we address in a concurrently filed memorandum disposition. (For clarity, we refer to Francis Calonge as "Calonge," and we refer to Rosalina Calonge as "Ms. Calonge.")

# I.

## A.

During the afternoon of October 31, 2019, Calonge was near a shopping center in San Jose.  He was carrying a Powerline 340 BB gun.  A passerby, thinking that Calonge had a real handgun, called 911.  About fifteen minutes later, a driver called 911 and reported a man with a gun walking down a street near the shopping center.  That second caller expressed concern for the safety of students at nearby Independence High School, which released its students around the time of the call.

The San Jose Police Department dispatched officers to the area.  Officers Carboni, McKenzie, Yciano, and Pedreira were among those who responded.  Officer Carboni requested that the San Jose Guardian Unit, a team trained to respond to active school shooters, be dispatched to Independence High School.  Officer Carboni then exited his vehicle holding his rifle and activated his body-worn camera.  Calonge was about twenty yards up the street, walking toward the officers.  He was walking away from the school, which was about three blocks behind him.  Officer Carboni testified that Calonge had the gun in his front waistband and was resting his right hand on it.

Officer Carboni began shouting commands to Calonge, including "let me see your hands" and "drop it."  A different officer shouted for Calonge to "drop the gun."  A third officer shouted, "do not reach for it."  That may have been Officer Yciano, who later testified that he instructed Calonge, "don't reach for the gun."  A police report states that Officer Yciano also told Calonge to "get on the ground."  Yet when asked at his deposition about what commands he gave, Officer Yciano testified only that he told Calonge not

to reach for the gun and to drop the gun. He testified that he recalled an unspecified other officer telling Calonge to get on the ground. No command to get on the ground is audible in the body-worn camera footage.

When the officers began shouting commands, Calonge paused, crossed the street, and began heading in the opposite direction, away from the officers and generally toward the school. Officers Carboni, McKenzie, and Yciano followed him on foot at a distance of ten to thirty yards, walking along the road's median, while Officer Pedreira followed in a police car. According to the officers, Calonge looked over his shoulder a few times and smiled. He continued walking, but he did not speed up.

Officer Carboni started to say something to the other police officers. He began, "I'm gonna—hey . . ." before trailing off. He then shouted for Calonge to "drop it." A few seconds later, he said to the other officers, "Hey, watch out, I'm gonna shoot him. Watch out, watch out. Get out of the way." That statement took three seconds. Officer Carboni spent three more seconds steadying his rifle against a tree. He then shot Calonge once in the back. The bullet struck Calonge's heart, killing him. At no point had Officer Carboni warned Calonge that he was going to shoot. Just over one minute had elapsed between when Officer Carboni exited his police car and when he fired his gun.

Officer Carboni later testified that he fired his gun for two reasons. First, he said he saw Calonge's arm "bow out" such that there was space between his arm and his body, suggesting that he was drawing the gun. Second, Officer Carboni claimed that Calonge was walking toward some students who were ten or fifteen yards ahead and that he feared Calonge would take the students hostage.

Other evidence conflicts with both of Officer Carboni's stated reasons for shooting.  As to whether Calonge moved his arm, although Officer McKenzie later stated that he saw Calonge's arm move away from his body, Officer Pedreira stated that he did not see Calonge do anything that suggested he was pulling his gun out of his waistband during the minute before he was shot.  And Officer Yciano stated that he saw Calonge only "turn[] at an angle . . . as if he was trying to hide" the gun from the officers.[2]

As to whether there were students nearby, Officer Pedreira stated that he did not see anyone on the corner of the intersection toward which Calonge was headed.  The footage from the body-worn cameras, including Officer Carboni's camera, does not show any bystanders near Calonge or further down the sidewalk toward the intersection.

**B.**

Ms. Calonge, acting as her son's successor in interest, sued Officer Carboni under 42 U.S.C. § 1983 for violating Calonge's Fourth Amendment right to be free from excessive force.

At the close of discovery, Officer Carboni moved for summary judgment on the ground that he was entitled to qualified immunity either because his actions did not violate the Constitution or because the applicable law was not clearly established.

Ms. Calonge opposed the motion.  She argued principally that the district court could not grant qualified

---

[2] None of the footage from the officers' body-worn cameras shows Calonge's arm in the moments before the shooting.

immunity at the summary judgment stage because there were genuine disputes of material fact. She also argued that qualified immunity was inappropriate because the relevant law was clearly established. But she did not cite analogous cases, arguing that it was unnecessary to do so because the constitutional violation was obvious.

The district court held that Officer Carboni was entitled to qualified immunity, and thus to summary judgment in his favor, because Ms. Calonge had failed to identify specific caselaw clearly establishing that Officer Carboni's conduct violated the Fourth Amendment.

## II.

We review de novo the question whether a defendant is entitled to summary judgment on the basis of qualified immunity. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* An officer may be denied summary judgment on the basis of qualified immunity

> only if (1) the [evidence], taken in the light most favorable to the party asserting injury, show[s] that the officer's conduct violated a

constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation.

*Torres*, 648 F.3d at 1123.

## A.

"We 'must view the evidence in the light most favorable to the nonmoving party'"—here, Ms. Calonge—"'and draw all reasonable inferences in that party's favor.'" *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1158 (9th Cir. 2021) (quoting *Dees v. County of San Diego*, 960 F.3d 1145, 1151 (9th Cir. 2020)). Where a police officer has used deadly force, it is especially important that we adhere to that approach. We "cannot 'simply accept what may be a self-serving account by the police officer' . . . [b]ecause the person most likely to rebut the officers' version of events— the one killed—can't testify." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Rather, "we must carefully examine the evidence in the record to determine whether the officers' testimony is internally consistent and consistent with other known facts." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 791 (9th Cir. 2014) (en banc).

We resolve three disputed facts in Ms. Calonge's favor for the purpose of this appeal. First, we assume that Calonge was not drawing his gun or otherwise making a threatening gesture when Officer Carboni shot him. Officers Carboni and McKenzie both say they observed Calonge's elbow move away from his body just before Officer Carboni fired his rifle. But Officers Pedreira and Yciano were also

watching Calonge at the time, and they saw no such movement. We resolve the dispute in Ms. Calonge's favor at this stage.

Second, we assume that there were no bystanders in Calonge's vicinity when he was shot. Officer Carboni stated that he saw bystanders at the intersection ten or fifteen yards ahead of Calonge, and that he believed Calonge might take those bystanders hostage. But Officer Pedreira stated that he did not see anyone at that intersection. The body camera footage shows that no one was on the sidewalk near Calonge. And although the footage does not provide a detailed view of the intersection, it does not appear to show anyone there, either. With such conflicting evidence, we again must resolve the dispute in Ms. Calonge's favor.

Third, we assume that the officers did not instruct Calonge to get on the ground (or otherwise stop). A police report attributes such a command to Officer Yciano, who in turn attributes it to some other officer. The footage of the incident reflects no such command. That inconsistency requires us to assume that Calonge was not instructed to get on the ground.[3]

---

[3] Based on later-obtained security camera footage and witness statements, the parties also dispute whether Calonge brandished or pointed his gun at anyone before police officers arrived. We need not decide that question because there is no indication that anyone in Officer Carboni's position could have been aware of any such conduct. *Davis v. United* States, 854 F.3d 594, 598 (9th Cir. 2017) ("[W]hen considering qualified immunity, we are . . . limited to considering what facts the officer could have known at the time of the incident."). No reports of such conduct were relayed to the officers by the emergency dispatcher, who reported only that there was a "suspicious person with a firearm."

**B.**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A police officer's use of deadly force against a person constitutes a seizure within the meaning of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). And a seizure violates the Fourth Amendment when it is objectively unreasonable. *Graham v. Connor*, 490 U.S. 386, 397 (1989). That standard "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Garner*, 471 U.S. at 8). "Stated another way, we must 'balance the amount of force applied against the need for that force.'" *Bryan v. MacPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010) (quoting *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003)). We conduct that balancing "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 831 (quoting *Graham*, 490 U.S. at 396).

On one side of our set of scales is the deadly force employed by Officer Carboni. "The intrusiveness of a seizure by means of deadly force is unmatched" because of a person's "fundamental interest in his own life." *Garner*, 471 U.S. at 9.

Balanced against that force is the "totality of the circumstances" that might justify it. *Id.* at 8-9. We must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at

396. Those factors are "non-exhaustive." *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017). Whether the suspect posed an immediate threat is the "most important factor." *Id.* at 1005-06 (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).

Taking the facts in the light most favorable to Ms. Calonge, the totality of the circumstances plainly did not justify deadly force. Starting with the most important factor, a reasonable jury could conclude that Calonge did not pose an immediate threat. The parties do not dispute that Officer Carboni reasonably (although mistakenly) believed that Calonge was carrying a real firearm. But police officers "may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). An immediate threat might be indicated by "a furtive movement, harrowing gesture, or serious verbal threat." *George*, 736 F.3d at 838. If a person possesses a weapon but "*doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him." *Cruz*, 765 F.3d at 1078. Here, we take as true that Calonge did not reach for his waistband or make a similar furtive or threatening movement. His mere possession of a gun did not justify the use of deadly force. Similarly, given that we must assume there were no bystanders in the vicinity, a threat to those nonexistent bystanders did not justify the use of deadly force either.

Nor can Officer Carboni's deadly force be justified on the ground that Calonge was not complying with the conflicting commands about what to do with the gun. Officer Carboni initially told Calonge to "drop it"; then started instructing Calonge, "let me see your hands"; and then again told him to "drop it." At that point, another

officer told Calonge to "drop the gun, man." About four seconds later, two officers shouted contradictory commands at the exact same moment: One told Calonge to "drop the gun," and the other instructed him, "do not reach for it." Given that the gun was in Calonge's waistband, it was impossible for him to both drop it and not reach for it. We have explained that when officers initially give conflicting commands, a person becomes non-compliant only after an "unequivocal" command is given and the person does not comply. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1094 n.7 (9th Cir. 2013) (stating that "[i]t is the time from [an] *unequivocal* . . . command . . . that matters" for determining whether—and, if so, for how long—a person was non-compliant).

The commands arguably remained conflicting up until Officer Carboni fired. At most, the commands were no longer conflicting about eight seconds after the other officers' simultaneous contradictory commands, when Officer Carboni instructed Calonge to "drop it" and no other officer said anything. Three seconds after Officer Carboni shouted that command, he told the other officers that he was going to shoot Calonge, and he proceeded to do so. Three seconds of non-compliance (absent some other threat) does not justify deadly force. *Lopez*, 871 F.3d at 1007, 1010-11.

Nor was deadly force justified by the fact that Calonge continued to walk. Taking the facts in the light most favorable to Ms. Calonge, the officers did not instruct Calonge to stop or attempt to arrest him, so his actions certainly could not amount to fleeing arrest. Indeed, simply continuing to walk does not amount to fleeing arrest even in the face of an officer's commands to stop. *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1009, 1012 (9th Cir. 2016) (explaining that a person is not "flee[ing]" when

he "continue[s] to move at about the same speed," even when an officer instructs him to "get down").

Nor were the officers responding to the commission of a serious crime. A reasonable officer in Officer Carboni's position would have been aware of conduct by Calonge amounting to, at most, carrying a loaded firearm in public—a misdemeanor in California. Cal. Penal Code § 25850(c)(7). Under our caselaw, such an offense is not a serious crime that could justify a high degree of force. *Lopez*, 871 F.3d at 1006 (holding that a boy carrying what appeared to be an AK-47 rifle was "not committing a serious crime" justifying deadly force); *Bryan*, 630 F.3d at 829 (holding that "there [is] no substantial government interest in using significant force to effect [an] arrest" for misdemeanor violations).

Those considerations are sufficient to conclude that a reasonable jury could find that Officer Carboni's actions violated Calonge's Fourth Amendment rights. We note further that no officer warned Calonge that deadly force would be used. "[W]e have recognized that an officer must give a warning before using deadly force 'whenever practicable.'" *Gonzalez*, 747 F.3d at 794 (quoting *Harris*, 126 F.3d at 1201). To be sure, on its own, "[t]he absence of a warning does not necessarily mean" that deadly force was unreasonable. *Id.* at 797. But here, Officer Carboni had time to warn his fellow officers. Then more time passed before he shot Calonge. A warning was therefore clearly practicable. The fact that none was given makes the already unreasonable use of force even less reasonable.

## C.

We now turn to whether the Fourth Amendment violation here was clearly established. The law is clearly established when precedent is "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). It must be "clear to a reasonable officer" in the defendant's position "that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). That inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. "[S]pecificity is especially important in the Fourth Amendment context, where . . . '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (last alteration in original) (quoting *Saucier*, 533 U.S. at 205). "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 64 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). Outside of an obvious case, there must be precedent addressing the Fourth Amendment question in a "more particularized . . . sense." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Officer Carboni contends that Ms. Calonge forfeited any argument that the clearly established prong of the qualified immunity analysis was satisfied because she failed to "fully develop" her argument before the district court by citing

analogous cases. We must reject that forfeiture argument because of *Elder v. Holloway*, 510 U.S. 510 (1994). In *Elder*, our court had disregarded authority relevant to the clearly established prong of qualified immunity because the authority had not been cited to the district court. *Id.* at 514. The Supreme Court reversed, holding that "appellate review of qualified immunity dispositions is to be conducted in light of all relevant precedents, not simply those cited to, or discovered by, the district court." *Id.* at 512. The Court instructed that a court of appeals "engaging in review of a qualified immunity judgment should . . . use its 'full knowledge of its own [and other relevant] precedents.'" *Id.* at 516 (second alteration in original) (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n.9 (1984)). In *Elder*, the plaintiff had argued in the district court that the law was clearly established but did not cite analogous cases. Here, Ms. Calonge likewise argued in the district court that the law was clearly established but did not cite analogous cases. On appeal, Ms. Calonge continues to argue that the law was clearly established, and she now cites analogous cases. Under *Elder*, we must consider those cases and any other relevant law.

Applying our "full knowledge" of the relevant law, and properly construing the facts in the light most favorable to Ms. Calonge, we concluded above that a reasonable jury could find that Officer Carboni violated the Fourth Amendment. The precedents on which we have relied put the Fourth Amendment question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). When a man is walking down the street carrying a gun in his waistband, posing no immediate threat, police officers may not shout conflicting commands at him and then kill him. That rule was clearly established when Officer Carboni pulled the

trigger: Every precedent that we cited in our analysis of the violation prong of qualified immunity was decided well before October 31, 2019, when the shooting here occurred, and those cases directly controlled our analysis without elaboration.

We have held over and over that a suspect's possession of a gun does not itself justify deadly force. In *George*, police officers shot and killed a man who was "holding a gun with the barrel pointing down." 736 F.3d at 832-33. Because evidence conflicted as to "whether [the man] ever manipulated the gun, or pointed it directly at deputies," we held that a jury could reasonably conclude that the officers violated the Fourth Amendment by shooting him in the absence of any immediate threat. *Id.* at 833, 838-39. Similarly, in *Cruz*, police officers shot and killed a man they claimed was reaching for his waistband as he exited his car after a traffic stop. 765 F.3d at 1078. We explained that the only relevant question was whether the man was truly reaching for his waistband, because "if the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him." *Id.* We reached that conclusion even assuming that the police officers reasonably believed that the man was carrying a gun, and even though he had exhibited some "dangerous and erratic behavior" leading to the traffic stop. *Id.* at 1077-79. And in *Lopez*, a police officer shot and killed a boy who was carrying what appeared to be an AK-47. 871 F.3d at 1010-1011. We accepted as true that the boy "did not point the weapon at the officers or otherwise threaten them with it" and therefore held that there was no immediate threat that could have justified the officer's shooting. *Id.* at 1017 (emphasis omitted) (quotation marks omitted). We

further held that the possession of the gun was not a "serious crime" that could justify deadly force. *Id.* at 1006.

We have also previously recognized that a person cannot be considered non-compliant when he fails to obey conflicting commands. In *Gravelet-Blondin*, a neighbor approached officers who were responding to an in-progress suicide attempt by another man. 728 F.3d at 1089. One officer instructed the neighbor to "get back" while another officer commanded him to "stop." *Id.* at 1090. The neighbor did not come closer. *Id.* Some number of seconds later, an officer ran toward the neighbor and gave an "unequivocal 'get back' command," before tasing the neighbor. *Id.* at 1092. We explained that given the earlier "conflicting commands," the relevant duration of any non-compliance was solely the time after the "unequivocal" command. *Id.* at 1094 n.7 (emphasis omitted). Here, if the commands ever became non-conflicting, it was only when Officer Carboni gave the final instruction to "drop it." Three seconds later, Officer Carboni told the other officers that he was going to shoot Calonge, which he proceeded to do. *Lopez* is again directly on point—strikingly so. There, the officer shouted a single command to "drop the gun" to the boy, who was facing away from the officer. 871 F.3d at 1002-03, 1007. The boy did not comply for three seconds and then began to turn toward the officer, at which point the officer shot and killed him. *Id.* at 1007. We held that the use of deadly force was unreasonable. *Id.* at 1011. Precisely the same number of seconds elapsed in *Lopez* between the command to drop the gun and the use of deadly force as elapsed in this case

between the only uncontradicted command to drop the gun and Officer Carboni's decision to use deadly force.[4]

We have also previously held that continuing to walk as Calonge did is not fleeing. In *Landeros*, we held that a suspect did not "flee" when he "continued to move at about the same speed." 837 F.3d at 1012.

In his brief on appeal, Officer Carboni did not seriously dispute that, once the facts are construed in Ms. Calonge's favor, his conduct violated clearly established constitutional principles. Officer Carboni instead attempted to distinguish the controlling cases by improperly construing disputed facts in his favor and then arguing that Calonge posed an immediate threat, for example by asserting that Calonge "brandished the weapon and pointed it at bystanders."

At oral argument, Officer Carboni shifted gears, arguing that *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005), demonstrates that the law was not clearly established.[5] But *Blanford* differs from this case in multiple critical ways. There, officers shot a man with a sword. *Id.* at 1112. Before shooting, the officers consistently commanded the man to drop the weapon and warned "that

---

[4] *Lopez* is factually similar to this case in many other respects as well. The shooting in that case occurred "close to three schools" that were out of session, "[t]here were no other people present at the shooting" besides "a few individuals outside in the surrounding neighborhood," and the person shot "had been walking in the general direction of several houses." 871 F.3d at 1004. If anything, those facts are more defense-friendly than the facts here.

[5] Even though Officer Carboni did not cite *Blanford* until oral argument, we nevertheless give it full consideration, consistent with our obligation under *Elder v. Holloway*, 510 U.S. 510 (1994), to consider all relevant law.

they would shoot if he did not comply." *Id.* at 1116. In response, the man "raised his sword and growled" at the officers and then made multiple attempts to gain entry to a house or its back yard, where the officers reasonably believed there could have been other people and where he would no longer have been visible to the officers. *Id.* Here, Calonge was given conflicting commands, not consistent ones; he did not brandish his weapon or menace the officers; and he did not attempt to disappear into an area that could contain other people. He simply walked away from the officers on an empty sidewalk. Given the specifically relevant precedents that we have discussed, such a factually different case as *Blanford* would not lead a reasonable officer to believe that shooting a man in the circumstances here was reasonable.

Construing the facts in Ms. Calonge's favor, it would have been clear to a reasonable officer in Officer Carboni's position that shooting Calonge was unlawful. Officer Carboni is thus not entitled to qualified immunity.

## III.

For the foregoing reasons, we reverse the grant of summary judgment to Officer Carboni on the Fourth Amendment claim and remand for further proceedings.